1

2

3

4

5

6        IN THE UNITED STATES DISTRICT COURT FOR THE

7              EASTERN DISTRICT OF CALIFORNIA

8

9  GEORGINA SHANTELL THOMAS,    )      No. CV-F-05-1444 OWW/DLB
                                )
10                              )      ORDER GRANTING STATE CENTER
                                )      COMMUNITY COLLEGE DISTRICT
11              Plaintiff,      )      AND CITY OF FRESNO'S MOTION
                                )      FOR SUMMARY JUDGMENT (Docs.
12         vs.                  )      67 & 90), GRANTING NATIONAL
                                )      RAILROAD PASSENGER
13                              )      CORPORATION AND BNSF RAILWAY
   BURLINGTON NORTHERN SANTA FE )      COMPANY'S MOTION FOR SUMMARY
14 CORPORATION, et al.,         )      JUDGMENT (Docs. 70 & 88) AND
                                )      DIRECTING CLERK OF COURT TO
15              Defendant.      )      ENTER JUDGMENT FOR ALL
                                )      DEFENDANTS AND AGAINST
16                              )      PLAINTIFF
   _____)

17

18

19

20

21        Plaintiff Georgina Shantell Thomas (hereinafter referred to

22 as Plaintiff), now proceeding *in pro per*, filed a Complaint for

23 Damages for Wrongful Death on October 14, 2005,  arising from the

24 death of her son, Deondrae Mullin on September 2, 2004, who was

25 struck at the Weldon Avenue Crossing on the campus of Fresno City

26 College by a passing Amtrak train on the tracks and right-of-way

                              1

of BNSF Railway Company.

The First Cause of Action of the Complaint alleges that Defendants Fresno City College, State Center Community College District and the City of Fresno

>          15. ... possessed, controlled, maintained,
>          operated, inspected, licensed, installed,
>          sited, constructed, leased, positioned,
>          furnished, serviced, repaired, used, owned,
>          or designed Weldon Avenue, at or near its
>          intersection with Glenn Avenue, in whole or
>          in part, and specifically the area in which
>          the decedent was killed, including, but not
>          limited to, the public street, the public
>          sidewalks, the train tracks, the crossing
>          gates and all systems related thereto, the
>          plants and the artificial structures placed
>          in the vicinity of the intersection of Weldon
>          Avenue and the train tracks and any and all
>          other surrounding features of said area.

>          16.  On ... September 2, 2004, and prior
>          thereto, said public street, pedestrian
>          crossing, intersection, crossing gates and
>          related systems were in a hazardous,
>          defective and unsafe and dangerous condition
>          because of a combination of factors existing
>          thereupon, which conditions created a
>          substantial risk of injury when said public,
>          [sic] intersection, pedestrian crossing,
>          crossing gate and signals located at said
>          intersection were used with due care in a
>          manner in which it was reasonably foreseeable
>          that they would be used; in that at said time
>          and place and prior thereto, defendants, and
>          each of them, failed to control said location
>          despite the recognized danger presented by
>          fast-moving trains traversing the campus and
>          numerous fatalities which had occurred at
>          said site since its design and construction
>          so as to create a trap to members of the
>          general public, including decedent, who were
>          invited to use the pedestrian crossing by
>          defendants, and each of them.

The First Cause of Action alleges that defendants, and each of them, created a dangerous condition of public property: (A) in

the manner in which it constructed and maintained the area around the intersection of the train tracks and Weldon Avenue at the time of the subject incident; (B) in placing and maintaining train tracks that traversed through the middle of the college campus; (C) by failing to change the design, layout and construction of the tracks at Weldon Avenue after the time that the Fresno City College campus expanded from being located entirely west of the tracks to adding campus property on the east side of the tracks; (D) by placing a concrete wall and foliage on the north side of Weldon Avenue just east of the tracks so as to obstruct and minimalize a pedestrian's ability to determine that a train was coming and to minimalize the perception of danger and risk that a pedestrian might have as the pedestrian approached the track crossing on the sidewalk on the north side of Weldon Avenue; (E) by failing to install sufficient and proper crossing gates at the location of the incident including, but not limited to, a pedestrian crossing arm that would descend over the sidewalk area as trains approached in light of the prior history of trains striking pedestrians in the area of the college campus, generally, and Weldon Avenue, specifically; (F) by allowing Amtrak trains and other trains operated by Burlington Northern Santa Fe Corporation/Burlington Northern and Santa Fe Railway Company to operate at speeds greater than were safe and reasonable for traversing a college campus; (G) by unreasonably placing and allowing tracks to be located in close proximity of a college campus where significant pedestrian traffic would exist

and where it would reasonably be and was, in fact, expected that young, inexperienced and less mature young people would frequently be required to cross over the train tracks as they walked through the campus; (H) by failing to properly provide reasonable warnings to pedestrians on Weldon Avenue of the danger of trains using the tracks that traverse Weldon Avenue and the Fresno City College campus, generally; (I) by creating a trap for pedestrians using Weldon Avenue where the street crosses the train tracks by failing to install proper warning devices, obstructing a pedestrian's view of the tracks and otherwise causing pedestrians to fail to appreciate the danger that existed at the railroad crossing as described above.   Paragraph 17 of the First Cause of Action alleges:

> 17.   Notwithstanding the facts alleged herein above, the defendants, and each of them, negligently, consciously, recklessly or otherwise tortiously, failed to correct or render safe said unsafe, defective, concealed, hazardous and dangerous conditions or failed to request that such remedial action be taken; and further, said defendants, and each of them, consciously, recklessly, negligently or otherwise tortiously, failed to post any signal, sign, markings or device or to give any warning of any type, or failed to request that such warning be given to decedent and others members [sic] of the general public within said area, and would not be reasonably apparent to or anticipated by decedent or other such persons exercising due care, and which defective, concealed, hazardous and dangerous condition created a reasonably foreseeable risk of the kind of injuries and damages hereinafter alleged.

The Second Cause of Action for negligence alleges in pertinent

4

part:

> 22.  On ... September 2, 2004, at
> approximately 9:20 a.m., decedent was on the
> railroad tracks which are owned, maintained
> and inspected by defendants BURLINGTON;
> NATIONAL RAILROAD PASSENGER CORPORATION
> (AMTRAK); CLARDLY LEE MULLIN, JR. [sic] and
> Does 1 through 500, inclusive.  This railroad
> track traverses the premises of Fresno City
> College ....
>
> 23.  At said time and place, defendants
> BURLINGTON; NATIONAL RAILROAD PASSENGER
> CORPORATION (AMTRAK); ERNEST MARTINEZ and
> Does 31 through 60, so negligently,
> carelessly and unlawfully operated, drove,
> owned, leased, entrusted, inspected, examined
> and maintained a certain train, along with
> all of the component parts, in such a manner
> that said train was proximately caused to and
> did run over the decedent ... killing him.

Defendants State Center Community College District (erroneously sued as Fresno City College) and City of Fresno move for summary judgment.  Defendants National Railroad Passenger Corporation (Amtrak) and BNSF Railway Company also move for summary judgment.

A.  <u>GOVERNING STANDARDS</u>.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  Materiality is determined by the substantive law

governing a claim or a defense.  *Id*.  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id*.

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  *Id*.  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint."  *Id*.  A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence. *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir.2000).  As explained in *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001):

> [T]he district court may determine whether there is a genuine issue of material fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and specifically referred

> **to and facts therein set forth in the motion papers.  Though the court has discretion in appropriate circumstances to consider other materials, it need not do so.  The district court need not examine the entire file for evidence establishing a genuine issue of material fact, where the evidence is not set forth in the opposing papers with adequate references to that it could conveniently be found.**

**The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995).  This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff."  *Id.*  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment."  *Id.***

 **B.   STATE CENTER COMMUNITY COLLEGE DISTRICT AND CITY OF FRESNO'S MOTION FOR SUMMARY JUDGMENT.**

  **1.   STATEMENT OF DISPUTED FACTS.**

 **In Plaintiff's Statement of Genuine Issues in opposition to this motion for summary judgment, Plaintiff states that she "agrees with ALL undisputed Facts but would like The Court to consider" certain facts and/or issues in resolving the motion for summary judgment.  *See infra*.**

 **Given Plaintiff's concession, the following facts set forth**

by State Center Community College District and City of Fresno are undisputed.

**UMF 1**: On September 2, 2004, at approximately 9:20 a.m., Deondrae Mullin was walking on the north side of Weldon Avenue crossing over the railroad tracks that intersected Weldon Avenue, when he was struck and killed by a passing northbound Amtrak train traveling on the tracks and right-of-way of Defendant BNSF.

**UMF 2**: The intersection of the railroad tracks and Weldon Avenue is on the campus of Fresno City College, which is operated by State Center Community College District.

**UMF 3**: The roadway constituting Weldon Avenue on the east side of the railroad tracks is owned by the City of Fresno.

**UMF 4**: A block wall and foliage are located near the Health Science building, east of the tracks and north of Weldon Avenue.

**UMF 5**: The train involved in this accident did not come from the direction of the wall and foliage.  The train came from the opposite direction, traveling from the southeast to the northwest.

**UMF 6**: The fencing on the south side of Weldon Avenue and each of the tracks was, and is, comprised of wrought iron bars, with approximately 6 inches of space between each metal bar.

**UMF 7**: BNSF owned, controlled, leased, managed, operated, supervised, maintained, constructed, repaired and otherwise was responsible for the railroad tracks and the safety equipment in the immediate vicinity of the accident.

**UMF 8**: On September 2, 2004, the following train warning

8

devices were present: (1) vehicular crossing arms with two
flashing lights; (2) one constant-red tip light, 12" diameter
train-warning-red-flashing lights; (3) train-warning gong; and
(4) train whistle/horn blasts and bells emitted by the train
engine.

UMF 9: On September 2, 2004, the roadway at the grade
crossing contained two painted cross-bucks and a yellow warning
sign was posted on the roadway before the at-grade crossing.

UMF 10: On September 2, 2004, at the time of the accident,
the vehicular crossing arms with two flashing lights, the 12"
diameter train-warning-red-flashing lights, the train-warning
gong, and the train whistle/horn blasts and bells emitted by the
train engine, were activated and functioning.

UMF 11: On September 2, 2004, Jessica McAllister and two
other individuals attended class with Deondrae Mullin in the
Health Science building on the Fresno City College campus.

UMF 12: After class was let out, Ms. McAllister, two
classmates and Decedent left the Health Science building and
walked on the sidewalk located north of Weldon Avenue and east of
the railroad tracks.

UMF 13: Ms. McAllister was advised by one of her classmates
that a train was coming and she heard the train horn blare as it
was proceeding in a northwest direction, crossing McKinley
Avenue.  As they continued to walk toward the tracks, Ms.
McAllister saw that the crossing arms were down, the big red
lights on the light pole were flashing, and she again heard the

train horn.

UMF 14: Ms. McAllister and her two classmates stopped at the light pole with the flashing red lights to wait for the train to pass.  Decedent failed to stop and walked into the path of the oncoming train.

UMF 15: At the time Decedent kept walking, it appeared to Ms. McAllister that he was distracted by two females ahead of him and that he was wearing earphones.

UMF 16: State Center Community College District and BNSF agreed to build a grade separation underpass just south of the Weldon Avenue Crossing, with State Center Community College District to seek funding from the State of California through the State Capital Outlay Program (Community College Construction Act of 1989).

UMF 17: This grade separation project provided for the construction of pedestrian and vehicular access beneath the BNSF railroad tracks at a point approximately 450 feet south of the intersection of the railroad tracks and Weldon Avenue, with the intersection ultimately to be permanently closed to vehicle and pedestrian access.

UMF 18: The underpass project was designated as a Life/Safety project with State Center Community College District's five year plan and the Chancellor's Office allowed State Center Community College District to bypass the Initial Project Proposal submission.

UMF 19: On April 2, 2002, the Board of Trustees for State

10

Center Community College District considered and adopted Resolution No. 02-72, that authorized the submission of Final Project Proposal to the State of California, Community Colleges Chancellor's Office.

**UMF 20**: The Final Project Proposal for the underpass project was prepared by Blair, Church & Flynn, a local civil engineering firm, working in conjunction with Caltrans, BNSF and SCCCD administrative staff.

**UMF 21**: In preparing the Final Project Proposal, Blair, Church & Flynn set forth and addressed three alternatives in dealing with the intersection: (1) do nothing to the intersection; (2) create a pedestrian and vehicular underpass access (grade separation) south of the intersection and allow continued vehicle/pedestrian access across the railroad tracks along Weldon Avenue until the underpass project was completed; and (3) close Weldon Avenue to through traffic and create pedestrian underpass.

**UMF 22**: State Center Community College District chose to proceed with the creation of a pedestrian and vehicular underpass access (grade separation) south of the intersection and allow continued vehicle/pedestrian access across the railroad tracks along Weldon Avenue until the underpass project was completed.

**UMF 23**: The State Chancellor's Office informed State Center Community College District that the underpass project had been approved and that State Center Community College District had the authority to prepare the preliminary plans for the project.

11

**UMF 24**: **Pursuant to the authority granted by the State Chancellor's Office, the Board of Trustees voted at its October 7, 2003 meeting to authorize an agreement with Blair, Church & Flynn for civil engineering services for the design of the underpass access at Fresno City College.**

**UMF 25**: **State Center Community College District, through its contact person, specifically told Blair, Church & Flynn that its preference was that the existing Weldon Avenue Crossing was to remain open for vehicular and pedestrian use, with the Weldon Avenue Crossing to be closed when the underpass project was completed.**

**UMF 26**: **The Engineering Project Manager, a registered professional engineer with Blair, Church & Flynn, determined, in his professional engineering opinion, that keeping the Weldon Avenue Crossing open until the underpass project was completed was technically accurate and met the design criteria set forth by State Center Community College District.**

**UMF 27**: **Approval of the preliminary plans was provided by the State Chancellor's Office on January 12, 2004.**

**UMF 28**: **The State Chancellor's Office approved the final working drawings and specifications on June 1, 2004.**

**UMF 29**: **The State of California, Department of General Services, Division of the State Architect, provided its written approval of the working drawings and specifications that was filed on May 24, 2004.**

**UMF 30**: **During the approval process with the State**

12

1  Chancellor's Office, Blair, Church & Flynn, on behalf of State
2  Center Community College District, contacted the City of Fresno
3  regarding vacating a portion of Weldon Avenue to the east of the
4  tracks and the entirety of Weldon Avenue to the west of the
5  tracks.

6  **UMF 31**: A September 2, 2003 drawing prepared by Blair,
7  Church & Flynn, entitled "Vacation of Street Right of Way - state
8  Center Community College District", was provided to the City of
9  Fresno for its review.

10  **UMF 32**: The City of Fresno was advised that State Center
11  Community College District was seeking vacation of the identified
12  city streets within the Fresno City College campus, as set forth
13  on the September 2, 2003 drawing, because of a proposed grade
14  separation crossing project that would eliminate the need for the
15  Weldon Avenue Crossing at the railroad tracks once the grade
16  separation project was completed.

17  **UMF 33**: In response to the request by State Center Community
18  College District, the City of Fresno wrote to utility companies
19  and other interested parties with an interest in the areas
20  possibly to be vacated.  Additionally, the City of Fresno sought
21  written input from the various City of Fresno departments that
22  might be impacted by the possible vacation of the streets.

23  **UMF 34**: The City of Fresno held a public meeting on March
24  30, 2004, for general public input.  On that same day, the City
25  Council for the City of Fresno adopted Resolution N. 2004-115,
26  which ordered the vacation of Weldon Avenue and other city

streets listed on Exhibit A-1 to Resolution No. 2004-115.

**UMF 35**: The Mayor for the City of Fresno approved the Council's adoption of Resolution No. 2004-115 in writing on March 31, 2004.

2.   <u>DANGEROUS CONDITION OF PUBLIC PROPERTY DOES NOT EXIST BECAUSE PLAINTIFF CANNOT ESTABLISH THAT DECEDENT USED PUBLIC PROPERTY WITH DUE CARE AT THE TIME OF THE ACCIDENT</u>.

California Government Code § 835 provides:

> Except as otherwise provided by statute, a public entity is liable for injury caused by a dangerous condition of public property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and either:
>
> (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

A "dangerous condition" is defined in Government Code § 830(a) as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."   To allege a Section 830 "dangerous condition", a

14

plaintiff is only required to show that the condition "creates a substantial risk of harm when used with due care by the public generally ...." *Murrell v. State of California ex rel. Dept. Pub. Wks.*, 47 Cal.App.3d 264, 267 (1975).  "So long as a plaintiff-user can establish that a condition of property creates a substantial risk to *any* foreseeable user of the public property who uses it with due care, [she] has successfully alleged the existence of a dangerous condition regardless of [her] personal lack of due care." *Fredetter v. City of Long Beach*, 187 Cal.App.3d 122, 131 (1986).

In moving for summary judgment on this ground, Defendants place primary reliance on three cases, *Mathews v. City of Cerritos*, 2 Cal.App.4th 1380 (1992), *Schofeldt v. State of California*, 61 Cal.App.4th 1462 (1998), and *Milligan v. Golden Gate Bridge Highway and Transportation District*, 120 Cal.App.4th 1 (2004).

In *Mathews*, a minor sued the City of Cerritos for injuries suffered when he lost control of his bicycle while riding down a steep hill in a city park.  The Court of Appeal affirmed summary judgment for the City, holding in pertinent part:

> A condition is not dangerous within the meaning of the statute 'unless it creates a hazard to those who foreseeably will use the property ... with due care.  Thus, even though it is foreseeable that persons may use public property without due care, a public entity may not be held liable for failing to take precautions to protect such persons.'
> ... Any property can be dangerous if used in a sufficiently abnormal manner; a public entity is required only to make its property

15

safe for reasonably foreseeable careful use
....

Reasonably foreseeable use with due care, as
an element in defining whether property is in
a dangerous condition, refers to use by the
public generally, not the contributory
negligence of the particular plaintiff who
comes before the court; the particular
plaintiff's contributory negligence is a
matter of defense.  Nevertheless, the
plaintiff has the burden to establish that
the condition is one which creates a hazard
to persons who foreseeably would use the
property with due care ....

In *Fredette v. City of Long Beach,* [187
Cal.App.3d 122 (1986)] ..., the court held
the intent of the statute is 'to impose
liability only when there is a substantial
danger which is *not* apparent to those using
the property in a reasonably foreseeable
manner with due care.' ... *Fredette* involved
a diving accident.  The court said, 'Here,
the absence of a gangplank and the
shallowness of the water between the pier and
the float were apparent to all users.  The
physical characteristics of the facility gave
immediate notice to those persons exercising
due care that diving from the pier was, in
and of itself, a hazardous activity that
should be avoided.  We think it clear that no
member of the public may ignore the notice
which the condition itself provides.' ....

The statutory definition of reasonably
foreseeable persons using the property with
due care takes into consideration the lower
standard of care which is expected of
children ....

Applying these principles here, we conclude
that the danger of riding a bicycle down a
very steep, wet, grassy hill is obvious from
the appearance of the property itself, even
to children exercising a lower standard of
due care ... Even children instinctively
recognize steepness of a hill and
slipperiness of wet grass.  The trial court
properly concluded there is no triable issue
of fact and no reasonable person would

16

conclude the property created a substantial
risk of harm to reasonably foreseeable child
users who use the property with the due care
expected of children.  'While it is common
knowledge that children often heedlessly
engage in games or activities which are
dangerous or harmful to their health, at some
point the obligation of the public entity to
answer for the malfeasance or misfeasance of
others, whether children or parents, reaches
its outer limits.

2 Cal.App.4th at 1384-1385.

In *Schonfeldt*, a minor who climbed a freeway fence, ran

across the freeway, and was struck by a truck, brought a personal

injury action against the State of California.  Summary judgment

for the State was affirmed on appeal, the Court of Appeal ruling

in pertinent part:

The Schonfeldts cite *Gardner v. City of San
Jose*, (1967) 248 Cal.App.2d 798 ... Their
reliance on *Gardner* is misplaced.  In
*Gardner*, a vehicle struck a minor pedestrian
crossing a dark, unmarked crosswalk at the
intersection of two city streets.  The
pedestrian subway underneath the street was
not illuminated on the evening of the
accident, and it was otherwise unsafe.  There
were no warning or yield-to-pedestrian signs
for the motorists.

The Court of Appeal upheld judgment for the
plaintiff after jury trial in *Gardner*.  The
situation created a 'trap' because both the
pedestrian and the driver had the right-of-
way due to the existence of the subway ...
Here, however, there was no trap nor right-
of-way for pedestrians on the freeway.  Brian
jumped a fence to illegally run across a
limited-access which had signs telling
drivers that pedestrians are not permitted to
be on the freeway.  Unfortunately, the
consequences of his actions are tragic, but
there is no liability here.

...

17

> '[P]ublic entities have no duty, as a matter
> of law, to prevent members of the public -
> including you children - from scaling walls
> and fences erected for the purpose of keeping
> them out of areas of relative danger.' ...
> That the instant fence was slightly shorter
> than state maintenance manual guidelines
> suggested does not establish a dangerous
> condition of the freeway ... Neither does the
> lack of warning signs on the freeway, because
> no concealed trap existed there ....
>
> None of the facts alleged here constitute a
> dangerous condition, either by themselves or
> in combination ... Brian chose to do
> something no reasonable person using due care
> would do under the circumstances alleged -
> jump a fence and run across a freeway ....

61 Cal.App.4th at 1466-1468.

In *Milligan*, a minor committed suicide by climbing over the three and one-half-foot railing and jumping from the Golden Gate bridge.  Her parents filed suit, alleging that the lack of a suicide barrier constituted a dangerous condition of public property.  The Court of Appeal affirmed the State's demurrer because the bridge was safe when used with due care, holding in pertinent part:

> The theory of appellant's challenged
> complaint was that the bridge constituted a
> dangerous condition of public property
> because it lacked a suicide barrier in
> addition to the existing three-and-one-half
> foot safety railing.  Appellant pled
> specifically that her 'daughter committed
> suicide by jumping off of the Golden
> GateBirdge.'  As the phrase implies, a
> suicide barrier would be used to protect
> those who intend to commit suicide by jumping
> off the bridge.  We conclude reasonable minds
> will reach but one conclusion as to whether
> the lack of a suicide barrier is a dangerous
> condition.  By definition, persons who use
> the bridge to commit suicide *are not* using

18

> the bridge in a manner used by the general
> public exercising ordinary care.  As a matter
> of law, the Bridge District cannot be held
> liable for its failure to install a suicide
> barrier to protect those who intentionally
> used the bridge without due care.

120 Cal.App.4th at 7.

Noting that the plaintiffs in *Mathews, Schonfeldt* and *Milligan* contended that additional precautions should have been taken to prevent the harm that occurred, Defendants argue that summary judgment based on the conclusions of these cases is required with regard to the allegations in paragraph 16 (A) through (F).  The undisputed facts establish Decedent's failure to exercise due care.  The existence of the railroad tracks themselves provided "an open and obvious" warning to pedestrians that trains pass by.  The train warning devices were in place and operating at the Weldon Avenue Crossing on the date of the accident, as well as the warning devices on the train itself. Ms. McAllister's evidence establishes that she and two other classmates heard the warning devices from the oncoming train and saw the warning devices at the Weldon Avenue Crossing in operation as they walked with Decedent towards the tracks.  She and her two classmates stopped at the crossing to wait for the train to pass.  Decedent did not stop and appeared to be distracted by two females ahead of him and appeared to be wearing earphones.  As Defendants contend:

> Although faced with these various and obvious
> warning devices as the train approached, and
> despite the fact that other pedestrians
> walking in the same direction and on the same

19

side of the street had stopped to allow the
train to pass because the activated warning
devices, and the train itself, made them
aware that a train was approaching, Mr.
Mullin inexplicably ignored these activated
warning devices and continued into the path
of the train.  The failure to heed the
activated warning devices was akin to someone
jumping over a suicide railing, jumping a
fence and running across a highway or someone
riding their bike down a slippery and muddy
hillside.  The danger was open and obvious on
the date of the incident and a reasonable
person, using the subject public property
leading up to the train tracks, would not
have ignored the activated warning devices
that other people had paid heed to and walked
into the path of the train.  As tragic as the
facts are in this case, the public property
owned by State Center and the City of Fresno
was not in a dangerous condition when used
with due care by the general public and the
sole cause of this unfortunate incident was
the failure to Mr. Mullin to use due care.

Defendants are entitled to summary judgment with regard to

the allegation that a wall and foliage to the north and east of

the Weldon Avenue Crossing blocked the view of the oncoming

train.  The undisputed evidence set forth above establishes that

the train, traveling southeast to northwest, was approaching the

Weldon Avenue Crossing from Decedent's left.  Decedent had an

unobstructed view of the oncoming train as the fencing to his

left which was constructed of wrought iron bars spaced

approximately 6" apart.

Although Plaintiff does not dispute any of the facts set

forth above, she has filed a Declaration in which she avers in

pertinent part:

3.  When the incident occurred it was
perceived (from witnesses) that Deondrae had

20

1    no knowledge of the approaching locomotive
     and no one made him aware of this Danger
2    [sic].

3    4.  Deondrae had previously had eye surgery
     (May 2004) in which there was a lens placed
4    over his left eye (eye was impaired).
     Deondraes [sic] lens had yet to adjust at the
5    time of death.  Deondrae wore glasses but the
     left eye piece was removed in order for the
6    lens and eye to adjust.  Not one student
     exercised common courtesy in making the
7    decedent aware of danger (coming train).  As
     a result Deondrae walked right into the path
8    and was swept away never to return.  Deondrae
     left behind his loving family to mourn his
9    death and think of him continuously.

10   The averments in Plaintiff's declaration do not constitute

11   admissible evidence sufficient to withstand summary judgment.

12   The averment in Paragraph 1 is inadmissible opinion unsupported

13   by any evidence or declarations by eyewitnesses.  The averment in

14   Paragraph 2 concerning her son's continued vision impairment

15   following the surgery is inadmissible lay opinion as to a medical

16   condition.  The averment in Paragraph 2 that witnesses failed to

17   make her son aware of the oncoming train is unsupported by any

18   evidence or declarations of eyewitnesses and, in any event, would

19   not establish a breach of any duty owed to her son by the moving

20   Defendants.

21   Plaintiff asserts in her brief that Deondrae used "'DUE

22   CARE' as much as her [sic] could considering his 'DISABILITY'.

23   Plaintiff contends in her brief:

24   At a young age Deondrae was diagnosed by Dr.
     Sidney Ames that he was blind in left eye.
25   Later in years (before his 18th birthday) it
     was decided by Dr. Kaye that Deondrae would
26   have surgery to implant a lens over the left

21

> eye so that maybe he would be able to see
> better.  The surgery was completed in May of
> 2007 [sic].  As of September 2, 2004 Deondrae
> had not yet adjusted to the lens in his eye
> at the time of his death.  Referring to the
> statement from Martinez (police report), 'saw
> the victim following behind a pack of
> students, looking straight ahead.  The
> subject made no effort to hurry or run and
> didn't acknowledge the train until it was too
> late.'  Through perceived deductions physical
> actions shows that there was no need for the
> decedent to feel his life was in danger.

Again, Plaintiff's assertions are inadmissible hearsay and

lay opinion evidence unsupported by any admissible evidence or

declarations.[1]

Summary judgment for Defendants with regard to Plaintiff's

claim that Defendants created or maintained a dangerous condition

of public property is GRANTED.

### 3.  DESIGN IMMUNITY.

Even if summary judgment was denied with respect to a

dangerous condition of public property, Defendants are entitled

to summary judgment because of the design immunity set forth in

California Government Code § 830.6.

Government Code § 830.6 provides in pertinent part:

> Neither a public entity nor a public employee
> is liable under this chapter for an injury
> caused by the plan or design of a
> construction or, or an improvement to, public
> property where such plan or design has been
> approved in advance of the construction or
> improvement by the legislative body of the

---

[1]Plaintiff's averments and/or contentions also are deficient because of Plaintiff's failure to comply with the requirements of Rule 56-260(b), Local Rules of Practice, requirements of which Plaintiff was made aware by Order filed on April 3, 2007 (Doc. 86).

> public entity or by some other body or
> employee exercising discretionary authority
> to give such approval or where the plan or
> design is prepared in conformity with
> standards previously so approved, if the
> trial ... court determines that there is any
> substantial evidence upon the basis of which
> (a) a reasonable public employee could have
> adopted the plan or design or the standards
> therefor or (b) a reasonable legislative body
> or other body or employee could have approved
> the plan or design or the standards therefor.

"Section 830.6 design immunity is asserted as an affirmative defense in actions arising out of an alleged dangerous condition of public property.  It is ordinarily raised on a motion for summary judgment or nonsuit; the court decides whether there is sufficient evidence to support it ... It is error to submit the issue to a jury."  *Higgins v. State of California*, 54 Cal.App.4th 177, 184 (1997).  The Court of Appeal in *Higgins* further explains:

> In determining the sufficiency of the state's
> proof, the court 'must bear in mind the
> rationale underlying the theory of design
> immunity.  "Basically, this defense is
> predicated upon the concept of separation of
> powers - that is, the judicial branch through
> court or jury should not review the
> discretionary decisions of legislative or
> executive bodies, to avoid the danger of
> 'impolitic interference with the freedom of
> decision-making by those public officials in
> whom the function of making such decisions
> has been vested.' ... Additionally, judicial
> economy underlies design immunity -
> forbidding a jury from reweighing the same
> factors considered by the governmental entity
> which approve[d] the design ...."' ....
>
> If there is *any substantial evidence*
> supporting the reasonableness of the approved
> design, design immunity applies.  This is
> true even though the plaintiffs present

1
2
3
4
5

> evidence of a design defect: 'That a paid
> expert witness for plaintiff, in hindsight,
> found ... the design was defective, does not
> mean, ipso factor [sic], that the design was
> unreasonably approved.' ... '[A]s long as
> reasonable minds can differ concerning
> whether a design should have been approved,
> then the governmental entity must be granted
> immunity.' ....

54 Cal.App.4th at 185.  To prevail on the design immunity

affirmative defense, Defendants have to show: "'(1) [a] causal

relationship between the plan and the accident; (2) discretionary

approval of the plan prior to construction; [and] (3) substantial

evidence supporting the reasonableness of the design.'" *Id*.

### a.  <u>CAUSAL RELATIONSHIP</u>.

"[A] causal relationship between the plan and the accident

... requires proof that the alleged design defect was responsible

for the accident, as opposed to some other cause." *Grenier v.

City of Irwindale*, 57 Cal.App.4th 931, 940).  "Causal

relationship is proved by evidence the injury-producing feature

was actually part of the plan approved by the governmental

entity: Design immunity is intended to immunize only those design

choices which have been made." *Higgins*, *supra*, 54 Cal.App.4th at

185.

With regard to Plaintiff's claim that Decedent would not

have been struck by the train if the Weldon Avenue Crossing had

been closed, the undisputed facts establish that a decision was

made to allow vehicular and pedestrian access through the Weldon

Avenue Crossing from 2002 to 2005 while the underpass project was

being planned and constructed.

State Center and BNSF agreed to build a grade separation underpass just south of the Weldon Avenue Crossing and the City agreed to vacate a portion of Weldon Avenue for parking use by State Center after being provided with a copy of the plans by State Center's agent.  At State Center's direction, a Final Project Proposal for the underpass project was prepared by Blair, Church & Flynn, civil engineers, working in conjunction with staff from Caltrans, BNSF and State Center.  In preparing the Final Project Proposal, Blair, Church & Flynn set forth and addressed three alternatives, one of which was to close Weldon Avenue to through traffic and create a pedestrian underpass. State Center chose to proceed with the creation of a pedestrian and vehicular underpass south of the intersection and to allow continued vehicle/pedestrian access across the tracks until the underpass project was completed.  State Center informed Blair, Church and Flynn that the Weldon Avenue Crossing was to remain open during the planning and construction of the underpass. After being informed, Blair, Church and Flynn provided in their project design for the continued use of the Weldon Avenue Crossing while the underpass project was planned, funded and constructed.

According to the Engineering Project Manager, the design and construction documents for the underpass project, which provided that the existing Weldon Avenue Crossing remain open until the project was completed, were technically accurate and met the design and operational criteria set forth by State Center.  The

City was advised that State Center was seeking vacation of identified city streets within the Fresno City College campus, as set forth in the September 2, 2003 design drawing, because the proposed underpass would eliminate the need for the Weldon Avenue Crossing once the project was completed.  Those streets to be vacated east of the tracks would accommodate the necessary realignment of the Weldon Avenue underpass and the construction of parking areas.

This undisputed evidence establishes that Decedent's injuries were caused by a feature inherent in the approved plan, i.e., leaving the Weldon Avenue Crossing open to vehicular/pedestrian traffic during the planning and construction of the underpass.

Summary judgment on this element of design immunity is GRANTED.

b.  <u>DISCRETIONARY APPROVAL OF PLAN PRIOR TO CONSTRUCTION</u>.

Defendants are entitled to summary judgment on this element because of the undisputed evidence that Defendants approved a design that kept the Weldon Avenue Crossing open while the underpass project was being planned and constructed.

On April 30, 2002, the Final Project Proposal, as approved by the Board of Trustees for State Center Community College District's Resolution No. 02-07, was submitted to the State Chancellor's Office.  Thereafter, the State Chancellor's Office informed State Center that the underpass project was approved and

that State Center had authority to prepare the preliminary plans. Pursuant to that authority, State Center's Board of Trustees voted on October 7, 2003 to authorize an agreement with Blair, Church and Flynn for civil engineering services for the design of the underpass.  Preliminary working plans were prepared and submitted to the State Chancellor's Office on December 4, 2003 and were approved by the State Chancellor's Office on January 12, 2004.  As required by the January 12, 2004 approval, on May 27, 2004,  State Center requested approval of the working drawings and authority to proceed to bid.  The State of California, Department of General Services, Division of State Architect, approved of the working drawings and specifications on May 27, 2004.  The State Chancellor's Office approved the working drawings and specifications on June 1, 2004.

The City, after public hearing on March 30, 2004, adopted Resolution No. 2004-114.  Resolution No. 2004-114 approved the vacation of identified streets within the Fresno City College campus, as set forth in the September 2, 2003 drawing, because of the proposed underpass project that would eliminate the need for the Weldon Avenue Crossing once the underpass project was completed, with the Weldon Avenue Crossing to remain open until the project was completed.

Because their respective governing bodies adopted resolutions pertaining to the underpass project, the design of which required the Weldon Avenue Crossing to remain in use until that project was completed, Defendants' motion for summary

judgment on this element of design immunity is GRANTED.

           c.   <u>SUBSTANTIAL EVIDENCE SUPPORTING REASONABLENESS OF DESIGN</u>.

As noted, "'as long as reasonable minds can differ concerning whether a design should have been approved, then the governmental entity must be granted immunity.  The statute does not require that property be perfectly designed, only that it be given a design which is reasonable under the circumstances.'" *Grenier v. City of Irwindale*, *supra*, 57 Cal.App.4th at 941.  The Court of Appeal explained:

> Generally, a civil engineer's opinion regarding reasonableness is substantial evidence sufficient to satisfy this element ... Approval of the plan by competent professionals can, in and of itself, constitute substantial evidence of reasonableness ... That a plaintiff's expert may disagree does not create a triable issue of fact.

*Id*.

The undisputed facts satisfy this element of design immunity.  The plan was approved by the engineering firm hired by State Center, by the Board of Trustees, the State Chancellor's Office, the State Architect, and the City, after recommendation of approval by the Engineering Division of the State Public Works Department.  Plaintiff has submitted no evidence or expert opinion that suggests the design of the crossing was not reasonable.

Defendants' motion for summary judgment on this element of design immunity is GRANTED.

**4.  CALIFORNIA PUBLIC UTILITIES CODE PRECLUDES LIABILITY OF STATE CENTER AND THE CITY**.

Defendants are entitled to summary judgment in connection with Plaintiff's claim that State Center and the City created a dangerous condition of public property "by failing to install sufficient and proper crossing gates at the location of the incident including, but not limited to, a *pedestrian* crossing arm that would descend over the sidewalk area as trains approached ...."

It is undisputed that BNSF owned, controlled, leased, managed, operated, supervised, maintained, constructed, repaired and otherwise was responsible for the railroad tracks and the safety equipment in the immediate vicinity of the accident.

California Public Utilities Code § 1202 provides that the PUC has the "exclusive power" in pertinent part:

> (a) To determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use, and protection of each crossing ... of each crossing of a public or publicly used road or highway by a railroad ... and of a street by a railroad or of a railroad by a street.
>
> (b) To alter, relocate, or abolish by physical closing any crossing set forth in subdivision (a).
>
> (c) To require, where in its judgment it would be practicable, a separation of grades at any crossing established and to prescribe the terms upon which the separation shall be made and the proportions in which the expense of construction, alteration, relocation, or abolition of crossings or the separation of grades shall be divided between the railroad

29

> ... corporations affected or between those
> corporations and the state, county, city, or
> other public subdivision affected.

Public Utilities Code § 1219 provides:

> The Legislature declares that Sections 1201
> to 1205, inclusive, are enacted a germane and
> cognate parts of and as aids to the
> jurisdiction vested in the commission for the
> supervision, regulation, and control of
> railroad .... corporations in this State, and
> the Legislature further declares that the
> authority and jurisdiction thus vested in the
> commission involve matters of state-wide
> importance and concern and have been enacted
> in aid of the health, safety, and welfare of
> the people of this State.

Even if Defendants wanted to demand that additional warning devices, such as a pedestrian gate, be installed at the Weldon Avenue Crossing, they did not have the power to alter the design of the Weldon Avenue Crossing and, therefore, did not and could not owe a duty to Plaintiff or the Decedent to install a pedestrian gate.

Defendants' motion for summary judgment on this ground is GRANTED.

C.   **AMTRAK AND BNSF'S MOTION FOR SUMMARY JUDGMENT.**

1.   **STATEMENT OF UNDISPUTED FACTS.**

In Plaintiff's Statement of Genuine Issues in opposition to Amtrak and BNSF's motion for summary judgment, Plaintiff states that she "agrees with ALL undisputed Facts but would like The Court to consider" certain facts and/or issues in resolving the motion for summary judgment. *See infra*.

Given Plaintiff's concession, the following facts set forth

by Amtrak and BNSF are undisputed.

**UMF 1**: On September 2, 2004, the Weldon Avenue Crossing was equipped with the following warning devices and crossing protective systems: (1) gates; (2) flashing lights (large 12" LED/red lights); (3) bells (or gongs); (4) yellow railroad crossing warning sign; and (5) fencing.

**UMF 2**: The fencing is an added crossing improvement that improves the protective systems by channelizing pedestrians to the Weldon Avenue Crossing where there are active warning devices.

**UMF 3**: Much of the fencing was constructed with federal funds.

**UMF 4**: These warning devices and protective systems provided reasonable warning of the presence of the BNSF railroad tracks.

**UMF 5**: The design and installation of the warning devices and protective systems at the Weldon Avenue Crossing are in accordance with the Manual on Uniform Traffic Control Devices ("MUTCD") set forth by the Federal Highway Administration as well as other nationally recognized design guidelines and standards. Further, pedestrian gates, which are not recommended by the MUTCD or other nationally recognized design guidelines and standards, were not indicated at this location.

**UMF 6**: In 2004 the equipment at the Weldon Avenue Crossing was inspected by BNSF on a monthly basis, including checking gates, lights, bells and battery power.

**UMF 7**: The last inspection prior to the incident was on

August 12, 2004.  Everything at the Weldon Avenue Crossing was in working order, including sufficient warning time (over 20 seconds) required by the Federal Railroad Administration ("FRA").

**UMF 8**: On September 2, 2004, Amtrak Train Number 701 was traveling north (or railroad west) on BNSF's mainline tracks in the Stockton Subdivision.  The train was operated by engineer, Ernest Partida.

**UMF 9**: Prior to beginning the trip the Amtrak engineers inspected the train, including the headlight, ditch lights and horn.  Everything was in working order.

**UMF 10**: The weather was clear with good viability.  The locomotive (Engine 2014) was equipped with windows giving the engineer clear visibility of the tracks in front and to the left and right of the tracks.

**UMF 11**: There were no visual obstructions at the Weldon Avenue Crossing that would have blocked Decedent's view of the Crossing or of the oncoming train.

**UMF 12**: The maximum allowable track speed at the Weldon Avenue Crossing was 80 miles per hour in accordance with federal regulations for FRA Class 4 track.

**UMF 13**: At approximately 9:20 a.m. on September 2, 2004, the train was approaching the Weldon Avenue Crossing at approximately 50-53 mph.  The train was traveling within the allowable speed for that location.

**UMF 14**: The lead locomotive of the train was equipped with a dual element headlight, two ditch lights, a warning bell and

horn.  These safety devices were functioning at the time of the accident.  They also were inspected after the accident and found to be in good working condition and in compliance with applicable regulations.

**UMF 15**: The Amtrak engineer sounded the train's horn to alert vehicles and pedestrians at the Weldon Avenue Crossing of the approach of the train.  The activation of the horn automatically activates the train's bell and the two flashing ditch lights at the base of the front of the locomotive.

**UMF 16**: On September 2, 2004, at the time of and before the accident, the vehicular crossing arms with two flashing lights, the 12" diameter train-warning-red-flashing lights, train-warning gong, and train whistle/horn blasts and bells emitted by the engine were activated and functioning.

**UMF 17**: The train warning horn was audible to pedestrians.

**UMF 18**: Analysis of the locomotive event recorder data confirms that the train warning horn sequence commenced more than 20 seconds prior to impact when the train was over 1400 feet from the accident location.  The locomotive bell and horn warnings provided were in compliance with the applicable state regulations and the General Code of Operating Rules ("GCOR") as adopted by BNSF and Amtrak.

**UMF 19**: The horn was also inspected and tested after the accident and found to be working properly and in compliance with applicable federal regulations.

**UMF 20**: At the very last instant before the train reached

33

the Weldon Avenue Crossing, a pedestrian (Decedent) walked out in front of the train.  Decedent did not appear to look up or look in the direction of the train.

**UMF 21**: The Amtrak engineer immediately applied the emergency brake, but the train could not stop in time to avoid impact.

**UMF 22**: The Amtrak engineer complied with the applicable rules and regulations and operated the train in a safe and reasonable manner by initiating his emergency response and train braking when Decedent unexpectedly walked into the train's path.

**UMF 23**: Based on the location of the point of rest ("POR") of the train, the locomotive event recorder data and the emergency braking capabilities of the train, impact with Decedent would not have been avoided even if the engineer would have initiated his emergency response when Decedent first came into view.  Train handling was not the cause of the accident.

**UMF 24**: The train and its component parts were properly inspected and maintained on the date of the accident.  There is no evidence that the maintenance and/or inspection of the train was a cause of the accident.

**UMF 25**: The Weldon Avenue Crossing equipment was inspected immediately after the accident on September 2, 2004.  All warning devices and protective systems were working as intended and provided sufficient warning time (over 20 seconds).  There was no damage to the equipment.  The signal download was obtained and confirmed that the equipment was working properly.

**UMF 26**: There is no evidence of any hazardous, defective, unsafe or dangerous condition of the Weldon Avenue Crossing.

**UMF 27**: There is no evidence that the accident was caused by any negligence by BNSF.

**UMF 28**: There is no evidence that the accident was caused by any negligence by Amtrak.

**UMF 29**: BNSF did not own, lease, operate, inspect or maintain the train involved in the accident.

**UMF 30**: In 2003, approximately $1 million of federal funds were allocated for the construction of the underpass (grade separation) with the understanding that, after completion of the underpass, the Weldon Avenue Crossing would be closed.

**UMF 31**: The federal funds used for the fencing and grade separation projects were specifically allocated by the federal government, though the Federal Highway Administration ("FHWA") to eliminate grade crossing hazards and to improve grade crossing safety in California along the Bakersfield to Port Chicago route.

Although Plaintiff does not contest any of the undisputed facts set forth above, she has filed a Declaration in which she avers in pertinent part:

> 3.   When the incident occurred it was perceived (from witnesses) that Deondrae had no knowledge of the approaching locomotive and no one made him aware of this Danger [sic].
>
> 4.   Deondrae had previously had eye surgery (May 2004) in which there was a lens placed over his left eye (eye was impaired). Deondraes [sic] lens had yet to adjust at the time of death.  Deondrae wore glasses but the

> left eye piece was removed in order for the
> lens and eye to adjust.  Not one student
> exercised common courtesy in making the
> decedent aware of danger (coming train).  As
> a result Deondrae walked right into the path
> and was swept away never to return.  Deondrae
> left behind his loving family to mourn his
> death and think of him continuously.

Plaintiff asserts that Deondrae used "'DUE CARE' as much as her [sic] could considering his 'DISABILITY'.  Plaintiff contends in her brief:

> At a young age Deondrae was diagnosed by Dr.
> Sidney Ames that he was blind in left eye.
> Later in years (before his 18th birthday) it
> was decided by Dr. Kaye that Deondrae would
> have surgery to implant a lens over the left
> eye so that maybe he would be able to see
> better.  The surgery was completed in May of
> 2007 [sic].  As of September 2, 2004 Deondrae
> had not yet adjusted to the lens in his eye
> at the time of his death.  Referring to the
> statement from Martinez (police report), 'saw
> the victim following behind a pack of
> students, looking straight ahead.  The
> subject made no effort to hurry or run and
> didn't acknowledge the train until it was too
> late.'  Through perceived deductions physical
> actions shows that there was no need to for
> the decedent to feel his life was in danger.

For the reasons set forth above, Plaintiff's averments and contentions are insufficient to withstand summary judgment.

### 2.   SUMMARY JUDGMENT FOR BNSF.

#### a.   OPERATION, INSPECTION AND MAINTENANCE OF AMTRAK TRAIN.

Asserting that the only claim alleged against BNSF is that set forth in Paragraph 23 of the Complaint, i.e., that BNSF "so negligently, carelessly and unlawfully operated, drove, owned, leased, entrusted, inspected, examined and maintained a certain

36

train, along with all of the component parts, in such a manner that said train was proximately caused to and did run over the decedent", BNSF contends that it is entitled to summary judgment as a matter of law.   BNSF refers to the undisputed evidence that BNSF did not own, lease, operate, inspect or maintain the Amtrak train that struck the Decedent.   Plaintiff has no contrary evidence.

Summary judgment for BNSF on these claims is GRANTED.

b.   <u>WARNING DEVICES</u>.

BNSF argues that, if Plaintiff had alleged other claims of negligence against it, BNSF is entitled to summary judgment. BNSF cites CACI 805:

> Railroad companies must post signs or other devices that give the public reasonable warning of the presence of its tracks.  A railroad company must use reasonable care in the design, installation, operation and maintenance of its warning signals and protective systems.  The amount of care that is reasonable depends on the particular characteristics of each crossing.

BNSF contends that the undisputed facts set forth above establish that it met the standard of care.  BNSF refers to the evidence that the Weldon Avenue Crossing had crossbucks, fencing and advance warning signs and was equipped with active warning devices including gates, lights and bells.  The lights are large 12" bright LED/red lights which are clearly visible to pedestrians and vehicles.  The bells are standard and audible for pedestrians.  BNSF also refers to the undisputed evidence that the gates, lights and bells were working properly at the time of

the incident.  BNSF refers to the undisputed evidence that it complied with FRA regulations by providing at least 20 seconds of warning time for the gates, lights and bells.

Plaintiff does not dispute this evidence and presents no evidence from which it may be inferred that BNSF breached any duty of care to provide pedestrians at the Weldon Avenue Crossing reasonable warning of the presence of the tracks and in the design, installation, operation and maintenance of its warning signals and protective systems.

Summary judgment for BNSF on these claims is GRANTED.

c.  <u>PREEMPTION</u>.

BNSF further argues that any claim for negligence in the design, construction, installation or adequacy of the warning devices at the Weldon Avenue Crossing on September 2, 2004 is preempted by federal law.

In *Norfolk Southern Railway Company v. Shanklin*, 529 U.S. 344 (2000), the Supreme Court addressed whether the Federal Railroad Safety Act (FRSA), 49 U.S.C. §§ 20101 *et seq.*, by virtue of 23 C.F.R. §§ 646.214(b)(3) and (4), pre-empts state tort claims concerning a railroad's failure to maintain adequate warning devices at crossings where federal funds have participated in the installation of such devices.

BNSF contends that it is undisputed that federal funds were used to improve the Weldon Avenue Crossing in projects approved by the FHWA by the construction of an iron fence and the construction of an underpass (grade separation).  The fence was

in place at the time of the accident, plans for the underpass were in process, and federal funds necessary for the construction of the underpass were allocated.

Plaintiff's opposition asserts that "[p]recautions could of been deemed if pedestrian rails had been implemented also as a contribution instead of just the iron gate."

However, Plaintiff's contention is preempted by *Shanklin* and its progeny.

Summary judgment for BNSF on the ground of preemption is GRANTED.

### d.  SUBSTANTIAL FACTOR.

BNSF alternatively argues that it is entitled to summary judgment even if summary judgment is otherwise denied because Plaintiff presents no evidence from which it may be inferred that its breach of duty was a substantial factor in causing the Decedent's death.

"In California, the causation element of negligence is satisfied when the plaintiff establishes (1) that the defendant's breach of duty (his negligent act or omission) was a substantial factor in bringing about the plaintiff's harm and (2) that there is no rule of law relieving the defendant of liability." *Leslie G. v. Perry & Associates*, 43 Cal.App.4th 472, 481 (1996).

BNSF concedes that California courts have not defined "substantial factor". However, BNSF refers to *People v. Caldwell*, 36 Cal.3d 210, 220 (1984), as providing "helpful guidance." In *Caldwell*, the California Supreme Court stated:

39

> To be considered a *proximate* cause of
> Belvin's death, the acts of the defendants
> must have been a "substantial factor"
> contributing to the result ... "[N]o cause
> will receive judicial recognition if the part
> it played was so infinitesimal or so
> theoretical that it cannot properly be
> regarded as a *substantial factor* in bringing
> about the particular result.  This is merely
> a special application of the general maxim –
> '*de minimus nor curat lex*' ...."

BNSF also cites Restatement (Second) of Torts § 433(b)(one

consideration in determining whether the defendant's acts were a

substantial factor is "whether the actor's conduct has created a

force or series of forces which are in continuous and active

operation up to the time of the harm, or has created a situation

harmless unless acted upon by another force for which the actor

is not responsible.").

As BNSF contends, the undisputed evidence establishes that

the Decedent was the substantial factor in his death.  The train

crew sounded their horn and whistle providing Decedent with

warning of their approach and there was clear sight-distance for

pedestrians at the Weldon Avenue Crossing.  This evidence

establishes that Decedent should have been able to see and hear

the approaching train before he walked onto the tracks.

Summary judgment for BNSF on this ground is GRANTED.

### 3.   SUMMARY JUDGMENT FOR AMTRAK.

Asserting that the only claim alleged against Amtrak is that

set forth in Paragraph 23 of the Complaint, i.e., that Amtrak "so

negligently, carelessly and unlawfully operated, drove, owned,

leased, entrusted, inspected, examined and maintained a certain

train, along with all of the component parts, in such a manner that said train was proximately caused to and did run over the decedent", Amtrak contends that the undisputed facts set forth above entitle it to summary judgment as a matter of law.

a.   <u>EXCESSIVE SPEED</u>.

Amtrak argues that any claim that the train was negligently operated at an excessive speed at the time of the accident is preempted by federal law.

In *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658 (1993), the Supreme Court held that, under the FRSA, 45 U.S.C. §§ 421-488, federal regulations adopted by the Secretary of Transportation and published at 23 C.F.R. § 213.9, preempted a state law negligence claim "only insofar as it asserts that petitioner's train was traveling at any excessive speed."  *Id.* at 676.  However, the Supreme Court noted:

> Petitioner is prepared to concede that the pre-emption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop the train to avoid a specific, individual hazard ... As respondent's complaint alleges only that petitioner's train was traveling too quickly given the 'time and place,' ... this case does not present, and we do not address, the question of FRSA's pre-emptive effect on such related claims.

*Id.* at 675-676 n.15.

Pursuant to 49 C.F.R. § 213.9, the allowable maximum operating speed for a passenger train on a Class 4 track is 80 m.p.h.  The evidence is undisputed that the Amtrak train was

traveling between 50-53 m.p.h. when the accident occurred.  As stated by the FRA, 63 Fed.Reg 333999 (June 22, 1998):

> FRA current regulations governing train speed do not afford any adjustment of train speed in urban settings or at grade crossings. This omission is intentional.  FRA believes that locally established speed limits may result in hundreds of individual speed restrictions along a train's route, increasing safety hazards and causing train delays.  The safest train maintains a steady speed.  Every time a train must slow down and speed up, safety hazards, such as buff and draft forces, are introduced.  These kinds of forces can enhance the chance of derailment with its attendant risk of injury to employees, the traveling public, and surrounding communities.

Defendants did not refer to the comment by the Supreme Court in *Easterwood* at footnote 15.  However, in *Armstrong v. Atchison, Topeka & Santa Fe Railway Co.,* 844 F.Supp. 1152, 1153 (W.D.Texas 1994), the District Court rejected plaintiff's contention that the condition of the crossing where the accident occurred was such that defendant's employees should have operated the train at a slower speed:

> [T]he *Easterwood* court noted that the regulations promulgated to enforce the FRSA 'should be understood as covering the subject matter of train speed with respect to track *conditions*, including the conditions *posed by grade crossings.*' ... 113 S.Ct. at 1743 (emphasis added).  The related safety regulations were adopted 'only after the hazards posed by track *conditions* were taken into account.' ... 113 S.Ct. at 1742 (emphasis added).  If the Court were to follow Plaintiff's argument, the *Easterwood* opinion would have no meaning, because it would allow state tort law to determine the maximum speed at a particular crossing based upon conditions already considered by the

1

2
       Secretary of Transportation.

3
       The 'specific, individual hazard' identified
       by the *Easterwood* court logically relates to

4
       the avoidance of a specific collision ... The
       holding in *Missouri Pacific R. Co. v. Lemon*,
       841 S.W.2d 501 ... is not inconsistent with

5
       this interpretation.  Liability was imposed
       in the *Lemon* case, in part, because the train

6
       engineer failed to reduce his speed even
       though his vision of an upcoming crossing was

7
       obscured by a number of 'illegally and
       improperly parked tank cars.' ... As the

8
       court noted, 'The improper parking of tank
       cars which obstruct the view of a crossing is

9
       not a hazard which the Secretary took into
       consideration when determining train speed

10
       limits under the FRSA.' ... Plaintiff's
       claims, however, specifically relate to

11
       conditions which were taken into
       consideration by the Secretary.  As such,
       they are preempted by the FRSA.

12

13
     In *Bakhuyzen v. National Rail Passenger Corp.,* 20 F.Supp.2d

14
1113 (W.D.Mich.1996), the Plaintiffs alleged that the engineer

15
should have operated the train at a slower speed because of (1)

16
limited visibility due to snowy weather conditions; (2) the

17
obstructed view from motorists looking westbound at the crossing;

18
(3) the lack of protection at the crossing; and (4) the

19
engineer's admission that this was a dangerous crossing.  The

20
District Court held that, with respect to the crossing hazards,

21
the *Easterwood* court noted that the speed regulations "should be

22
understood as covering the subject matter of train speed with

23
respect to track conditions, including the conditions posed by

24
grade crossings."  The District Court held that, in line with

25
this language from *Easterwood* a number of district courts have

26
held that excessive speed claims were preempted by the FRSA

despite the fact that the plaintiffs identified specific hazards associated with the particular crossing where the accident occurred.  20 F.Supp.2d at 1117.  However, the District Court held, the allegation that the weather conditions required the train to slow down is not preempted by the FRSA.  *Id.* at 1118.

In *Baker v. Canadian Nat.l/Illinois Cent. Railway Co.*, 397 F.Supp.2d 803, 812-814 (S.D.Miss.2005), the District Court held:

> ... It has been consistently emphasized that the kinds of conditions that could constitute a 'specific individual hazard" are limited to transient conditions that could lead to an imminent collision, such as a child standing on the railway or a motorist stranded on a crossing or improperly parked tank cars which obstruct the view of the train engineer ... In the case at bar, Baker submits that the work of the Hancock crew at the Greens Road crossing fits the definition of a specific, individual hazard, because in setting applicable speed limits, federal regulators obviously did not 'account[] for the possibility of a two-day construction job involving truck-drivers repeatedly driving across a crossing to dump vegetation and other debris removed from near the adjacent railroad track when they established the track classifications.' ... [T]he mere fact of workers in proximity to the tracks whose work requires them to frequently traverse a public crossing in dump trucks cannot reasonably be said to be a specific individual hazard as contemplated by *Easterwood*.  Simply put, this is '[a] condition that can be or is present at many sites" and thus is not a specific, individual hazard.

397 F.Supp.2d at 813-814.

In *Peters v. Union Pacific Railroad Company*, 455 F.Supp.2d 998, 1002 (W.D.Mo.2006), the District Court held that an allegation of an unwavering approach by a motorist to the

44

crossing was not preempted.

Plaintiff's claims concerning excessive speed are preempted. The possible exception to preemption noted in *Easterwood* does not apply to the undisputed facts because Plaintiff makes no reference to and presents no evidence of a specific individual hazard unrelated to the track conditions.

Summary judgment for Amtrak on this ground is GRANTED.

b.  <u>ELEMENTS OF NEGLIGENCE</u>.

Although Amtrak concedes that questions of negligence are usually reserved for the trier of fact, it notes that "summary judgment is proper where the facts are undisputed and only one conclusion may reasonably be drawn from them." *Flying Diamond Corp. v. Pennaluna & Co., Inc.*, 586 F.2d 707, 713 (9th Cir.1978); *see also Camacho v. Du Sung Corp.*, 121 F.3d 1315, 1317 (9th Cir.1997)("Although summary judgment in a negligence action is generally disfavored, it is proper where the facts are essentially undisputed and only issues of law remain").

Amtrak contends that it is entitled to summary judgment based on the undisputed facts set forth above. Plaintiff presents no evidence from which it may be inferred that the train was negligently operated, inspected, examined or maintained. The evidence set forth above establishes that the train was operating at a legal speed, that its warning lights and horn were properly operating, that the engineers had good viability and maintained a proper look out, that they saw the Decedent walk into the path of the train at the last instant, that the train's emergency brake

45

1   was immediately applied, and that, in the time it took the train

2   to stop, the accident could not be avoided.  Plaintiff presents

3   no evidence that negligent operation of the train caused the

4   accident.  The undisputed evidence the train was regularly

5   inspected and was inspected on the date of the accident and found

6   to be in proper working order.  Plaintiff presents no evidence

7   that negligent inspection or maintenance of the train caused the

8   accident.

9       Summary judgment for Amtrak on this ground is GRANTED.

10              c.   <u>AMTRAK NOT A SUBSTANTIAL FACTOR</u>.

11      Amtrak alternatively moves for summary judgment on the

12   ground that Decedent, not Amtrak, was the substantial factor in

13   causing his death.  *See discussion supra*.

14      For the reasons set forth above, summary judgment for Amtrak

15   on this ground is GRANTED.

16      D.   <u>PLAINTIFF'S IMPLIED REQUEST TO AMEND THE COMPLAINT</u>.

17      Plaintiff asserts in her oppositions to these motions that

18   she "would like the court to reside [sic] case under the

19   protection of The American Disability Act [sic] (42 U.S. Code

20   12102 and following)."

21      Rule 15(a), Federal Rules of Civil Procedure, provides that

22   "leave [to amend] shall be freely given when justice so

23   requires."  "The purpose of pleading is 'to facilitate a proper

24   decision on the merits' ... and not erect formal and burdensome

25   impediments to the litigation process.  Unless undue prejudice to

26   the opposing party will result, a trial judge should ordinarily

permit a party to amend its complaint." *Howey v. United States*, 481 F.2d 1187, 1990 (9th Cir.1973). However, "[t]his strong policy toward permitting the amendment of pleadings ... must be tempered with considerations of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' *Foman v. Davis*, 371 U.S. 178, 182 ... (1962)." *Schlacter-Jones v. General Telephone of California*, 936 F.2d 435, 443 (9th Cir. 1991).

Cases specifically hold that denial of leave to amend is not an abuse of discretion when the motion for leave to amend is an attempt to avoid pending summary judgment. *See Schlacter-Jones*, *id.*, 936 F.2d at 443 ("A motion for leave to amend is not a vehicle to circumvent summary judgment") and cases cited therein. Plaintiff's belated reference to Decedent's alleged disability and request to allege that Defendants somehow violated the ADA is clearly an attempt to forestall summary judgment. Discovery has been closed since December 28, 2006 and jury trial is set for August 14, 2007. The case has been pending since October 14, 2005. Plaintiff has been granted two extensions of time in order to retain an attorney, (Docs. 44, 46, 69, 84), and did not do so. Plaintiff's implied request to amend the pleadings to allege a violation of the ADA is untimely and DENIED.

E.   ENTRY OF JUDGMENT FOR ALL DEFENDANTS NAMED IN ACTION.

Of the Defendants named in the Complaint, Defendant County

of Fresno was dismissed from this action by Order filed on September 11, 2006 (Doc. 32).  By Order filed on March 27, 2006, all claims alleged against the State of California, Department of Transportation were remanded to the Fresno County Superior Court (Doc. 25).

By Order filed on September 27, 2006, Defendant Clardy Lee Mullin, Jr. was ordered to be served by publication.  There is no indication on the docket whether service by publication was effected.  Defendant Mullin is the father of Decedent Deondrae Marcquise Mullin and was named as a defendant in the action in order to protect the rights and interests of Plaintiff and Defendant Mullin.

Defendant Ernest Martinez, alleged to be an employee of either Amtrak or BNSF, does not appear from the docket to have been served.

No Defendants were substituted for Doe Defendants.

All Defendants who were served and appeared in this action have either been dismissed, remanded, or granted summary judgment.  There is not proof of service of process on the only two named Defendants who have not appeared.  The time for service of process has long passed and all pretrial proceedings in this action have been completed.

This record establishes that direction of judgment for all Defendants is appropriate.

## CONCLUSION

For the reasons stated above,

1.   **Defendants State Center Community College District and City of Fresno's motion for summary judgment is GRANTED on all grounds.**

2.   **Defendants National Railroad Passenger Corporation (Amtrak) and BNSF Railway Company's motion for summary judgment is GRANTED on all grounds.**

2.   **The Clerk of the Court is directed to ENTER JUDGMENT for all defendants and against Plaintiff.**

IT IS SO ORDERED.

**Dated:   July 12, 2007**                    _____/s/ Oliver W. Wanger_____
                                             UNITED STATES DISTRICT JUDGE

49